TEMPLE TRUST COMPANY ET AL V. W. H. SEWELL ET UX.

No. 7354.  Decided April 5, 1939.
Rehearing overruled June 28, 1939.
(126 S. W., 2d Series, 943.)

*Jno. B. Daniel,* of Temple, and *Critz & Woodward,* of Coleman, for plaintiffs in error.

It was not usury to purchase a negotiable instrument and contract at a discount without warranty of payment, and it was error for the court to hold said mechanic's lien contract and sale of the same usurious, or to ignore the same as a part of the transaction in question and treat the transaction as a loan of money by the Temple Trust Company to the plaintiffs, there being no evidence to support said holding. Great Southern Life Ins. Co. v. Williams, 105 S. W. (2d) 277; Medical Arts Bldg. Co. v. Southern Finance & Dev. Co., 28 Fed. (2d) 969; 1 Daniel Neg. Inst., sec. 726; 42 Tex. Jur. 22.

*Dibrell & Snodgrass,* of Coleman, for defendants in error.

The original loan contract is usurious in that the total amount of the principal notes together with the interest coupons attached thereto representing 7 per cent per annum interest to accrue thereon from their date to their maturities, executed by appellees is the sum of $2255.10, whereas as the total of $1350 actually loaned with interest thereon from the date of the loan to maturity at 10 per cent per annum is the sum of $2229, making the interest charged on the loan exceed the yield of 10 per cent per annum by the sum of $26.10. Rosetti v. Lozeno, 96 Texas 57; Deming Inv. Co. v. Giddens, 41 S. W. (2d) 260; Commerce Trust Co. v. Best, 124 Texas 583, 80 S. W. (2d) 942.

MR. JUDGE GERMAN, of the Commission of Appeals, delivered the opinion for the Court.

This suit was instituted in the District Court of Coleman County, Texas, by W. H. Sewell and wife, Lizzie D. Sewell, who will be designated plaintiffs. Temple Trust Company and its receiver were defendants, and will be so designated in this opinion. It resulted in a judgment for plaintiffs, which was affirmed by the Court of Civil Appeals. 108 S. W. (2d) 279. The suit involves a question of usury.

Prior to September 6, 1924, plaintiff W. H. Sewell made application to the Temple Trust Company, through R. E. L. Zimmerman, its local representative at Coleman, for a loan of $1350, to be used in constructing a house in the town of Coleman. The application was upon a blank furnished by Temple Trust Company through Zimmerman. This application was forwarded by Zimmerman to Temple Trust Company at Temple and that Company prepared all papers, which were returned to Zimmerman for execution. Upon receipt of the papers by Zimmerman plaintiffs, accompanied by one Edgar Manning, went to Zimmerman's office and all papers were executed contemporaneously. They were dated September 6, 1924. The loan took the following form:

1. Plaintiffs and Edgar Manning signed a mechanic's and materialman's lien contract, wherein and whereby Manning agreed to build the house in question and plaintiffs agreed to pay the sum of $1520 as the contract price, and lien was given upon certain lots owned by plaintiffs in the town of Coleman.

2. Plaintiffs executed note in the sum of $1520, payable to Edgar Manning and secured by the lien retained in the contract.

3. Attached to the contract was an assignment which was executed by Edgar Manning, by which the note and lien mentioned were assigned to Temple Trust Company, the recited consideration being $1350. Plaintiffs executed to Temple Trust Company seven notes aggregating the sum of $1520, the amounts and terms of which will be hereinafter set out.

4. Plaintiffs executed to Temple Trust Company a deed of trust lien on the lots described in the contract signed by Manning, reciting that such deed of trust lien was given in lieu of and to extend and renew the mechanic's and materialman's lien of the same date.

There were other papers executed, but they have no material bearing upon the questions involved.

The first material portion of the deed of trust is as follows:

"This conveyance is intended, however, as a trust for better securing the payment of seven certain promissory notes or bonds hereinafter called 'bond' bearing even date herewith, executed by W. H. Sewell and wife, Lizzie D. Sewell, payable to the order of Temple Trust Company, at its office in Temple, Texas, in Gold Coin Money of the United States of America, of the present standard of weight and fineness and further described as follows: Being for the sum of Fifteen Hundred Twenty Dollars ($1520.00) written in the following notes; four for One Hundred Dollars ($100.00) each, two for Two Hundred Dollars ($200.00) each, due, respectively, October 1st, 1925 to 1930, inclusive, and one note for Seven Hundred Twenty Dollars ($720.00) due October 1st, 1934, the makers reserving the option to pay each note in full October 1st, any year, by giving Temple Trust Company Thirty days advance written notice, bearing interest from date until maturity as therein provided, said interest being payable semi-annually on the first days of April and October in each and every year until the maturity of said bond, according to the tenor and effect of interest coupons of even date thereto attached, and bearing interest after maturity. Said bond stipulating that all interest coupons thereto attached shall bear interest at the rate of ten per centum per annum after maturity, and that the maker will pay ten per centum of the amount then due, as attorney's fees, if placed in the hands of an attorney for collection under the provisions of this mortgage."

■ The trial court made a finding that only $1350 was actually loaned, and that the sum of $170 was added into the principal

notes as additional interest, thus making the face of the bond $1520 instead of $1350. It is urged by defendants that the transaction was really a purchase by Temple Trust Company of the mechanic's lien note from Edgar Manning at a discount. The findings of the trial court completely negatived such contention. It is therefore proper to dispose of this question here.

As above shown, Sewell made application for a loan of only $1350, and not $1520. He testified that at the time of making the application that Zimmerman told him there would be a bonus on the $1350, but he didn't say how much. Sewell further testified that his real contract with Manning was for only $1350 and not for $1520. Zimmerman, after testifying that he was local representative or correspondent for Temple Trust Company at Coleman, testified as follows:

"Q. What were your duties and authority as their correspondent?

"A. To take applications.

"Q. For loans?

"A. Yes sir.

"Q. Or for the taking up of notes?

"A. Well, we don't take them up, but make loans.

"Q. But they did buy notes and mechanic's liens?

"A. Yes sir.

"Q. And they would put up money for regular loans and buy mechanic's lien contracts and renew them also. Is that correct?

"A. Well, I don't know about that buying mechanic's lien notes; they were all made together; the papers were all closed at the same time and signed at the same time and endorsed at the same time."

He further testified as follows:

"Q. What was the practice, or rule, of the Temple Trust Company at that time with reference to charging a bonus on the actual amount of money borrowed?

"A. They had no bonus; they called it over-reaching.

"Q. But they did, as a matter of fact, *and as a rule, add some 12% or more to the amount actually borrowed,* didn't they?

"A. Yes sir." (Emphasis ours.)

This loan was numbered 3494. The letter by the Temple Trust Company accompanying the papers when they were sent to Zimmerman had a heading as follows: "No. 3494-W. H. Sewell et vir.- $1520- Net $1350."

This evidence therefore is not only sufficient to support a

finding by the trial court that the use of the name of Edgar Manning and the device of a mechanic's lien note and contract was purely simulated, but practically excludes any other conclusion. This testimony also shows beyond dispute that the additional sum of $170.00 was to be put into the note or bond with the express purpose of making it appear as a part of the principal and to be regarded as such. While of course in law it could not lose its identity as interest, so far as protection of the borrower was concerned, yet in so far as the *intention* of the lender was concerned it became fixed as principal.

■ There is nothing to show how the additional $170.00 was allocated to the seven notes. However, the notes could be declared due on account of default at any due date, and regardless of how the $170.00 was allocated, if it had to be paid upon acceleration, its payment would constitute usurious payment of interest.

The deed of trust, after describing the indebtedness, contained the following provision:

"Whereas, for the better securing of said *bond,* with all interest to become due *thereon* to the said Temple Trust Company, or its successors and assigns, the said grantors herein do hereby covenant with the said Temple Trust Company, as follows: That we will pay said *bond* with the interest *thereon* as the same become due and payable; that we have a good and perfect title in fee simple to said property and have a right to convey the same to the said Temple Trust Company, and to its successors and assigns, in this mortgage as aforesaid; that we will pay all taxes and assessments, and premiums of insurance now due, or which may become due on said premises, or chargeable against said premises, or said bond, or upon the interest in said premises of Temple Trust Company, or its successors and assigns, before the same shall become delinquent,—provided that if any tax assessed within the State of Texas against the bond or debt secured hereby, or the interest in said premises of the said Temple Trust Company, or its successors and assigns *together with the interest* paid or agreed to be paid on such *bond* or debt, shall exceed ten per centum per annum, then the grantors shall not pay such excess, unless it shall have been first decided by the courts of last resort in this State, that the payment of such excess would not render ·this contract usurious, in which event grantors herein do covenant to pay the same on demand, and

that we will keep all fences, buildings and other improvements now on said premises, or hereafter put thereon, in good condition and repair, and will do no act by which the value of said premises may be impaired." (Emphasis ours.)

Provision is then made for payment of taxes, charges and assessments by Temple Trust Company, in case of default in payment of same by the plaintiffs; with provision that all such payments were to be added to the principal indebtedness and bear interest at the rate of 10 per cent per annum. The provisions with reference to acceleration are as follows:

"It is hereby further specially agreed that if any of said bond or any interest coupon thereto attached, or any taxes or assessments, or charge of any kind against said property which shall have been paid by the said Temple Trust Company, or its successors and assigns, remains unpaid for five days after the same are due, or in case any tax or assessment is assessed within the State of Texas against the debt or bond hereby secured, or the interest in said premises of the said Temple Trust Company, or its successors and assigns, or upon the rendering by any court of competent jurisdiction of a decision that the undertaking by the grantor as herein provided to pay any tax or taxes, is legally inoperative, then at the option of the said Temple Trust Company, or its successors and assigns, the whole indebtedness and all sums secured by this mortgage, towit: The *principal* and *interest then accrued* on said *bond,* and all advances made to or on account of the grantors herein for taxes, assessments, and charges of every kind, shall at once become due and payable, and the moneys due on said *bond* and for advances as aforesaid, may be collected by a sale under this mortgage, or by a suit in the Courts of Bell County, or otherwise, as the said Temple Trust Company, or its successors or assigns may elect." (Emphasis ours.)

From proceeds of any sale provision was made for payments as follows:

"Third, to the payment of said *bond,* together with all interest *thereon.*"

It seems to us from all of the foregoing language that there can be no doubt that the intention was that the "bond," including the additional interest, was to be paid in any and all events in case of acceleration. But it is argued that this result is avoided by the following clause:

"Provided that if any tax assessed within the State of Texas

against the bond or debt secured hereby, or the interest in said premises of the said Temple Trust Company, or its successors and assigns together with the interest paid or agreed to be paid on such bond or debt, shall exceed ten per centum per annum, then the grantors shall not pay such excess unless it shall have been first decided by the courts of last resort in this State, that the payment of such excess would not render this contract usurious, in which event grantors herein do covenant to pay the same on demand."

In our opinion, the effect of this clause is exactly the opposite. It will be noted that the parties were careful to say that if the taxes, plus the interest agreed to be paid on the bond (that is 7% on $1520) exceeded 10 per cent per annum, the borrower should not pay the excess over 10 per cent. They were careful, however, *not* to say that if the taxes, plus the interest *on* the bond, plus the interest *in* the bond, exceeded 10 per cent per annum the excess should not be paid. This omission is strikingly significant.

While counsel for defendants have made no contention, either by assignments of error or in argument, that the contract is saved from usury by certain provisions in the acceleration clause, yet is appropriate to notice those provisions. The contract provides that upon certain contingencies, "then at the option of the said Temple Trust Company, or its successors and assigns, the whole indebtedness and all sums secured by this mortgage, *towit*: The *principal* and interest then accrued on said *bond,* and all advances made to or on account of the grantors herein for taxes, assessments, and charges of every kind, shall at once become due and payable, and the moneys due on said bond and for advances as aforesaid, may be collected by a sale under this mortgage, or by a suit in the Courts of Bell County, or otherwise, as the said Temple Trust Company, or its successors or assigns, may elect."

■ The only possibility under which it could be argued that these provisions saved the contract from usury is to assert that by the use of the word "principal" in the foregoing clause the parties meant the *real* principal as distinguished from the simulated principal. We of course recognize that in so far as the rights of the borrower are concerned, and for the purpose of arriving at the amount of true interest, the sum of money actually loaned is the real principal. Adleson v. Ditmar, 124 Texas 564, 80 S. W. (2d) 939; Schmid v. City National Bank, 114 S. W. (2d) 854. We are wholly unable, however, to attribute this meaning to that word in this instance, when the

parties were particularly careful to define the principal themselves and to diligently clothe the added amount with all the habiliments of principal. It will be observed that the parties did not stop with the words "the whole indebtedness and all sums secured by this mortgage," but were careful to add the explanatory language: "towit: The principal and interest then accrued on said *bond.*" The principal referred to is expressly stated to be the principal of the *bond,* and not the real principal of the indebtedness. This is immediately followed by the statement that all moneys due on said *bond* may be collected.

■ It is strikingly significant to note that the parties had previously defined the "principal" of the bond as being "the sum of Fifteen Hundred Twenty Dollars ($1520), *written in the following notes.*" (Then follows description of notes totaling $1520.) Thus the lender expressly made the simulated principal the real principal, so far as its intention to collect the additional $170 was concerned. There is not a word or syllable in the entire transaction indicating that it ever thought of adopting the real principal instead of the simulated principal in collecting the money which it expected to exact of the plaintiffs. It would be absurd to say that the lender intended the additional $170.00 to be treated merely as a bonus, when brought to task under the usury laws of the State, when its agents testified that "they had no bonus,—they called it overreaching;" and then immediately stated that the rule was to add 12 per cent to the amount actually borrowed. If they, in their own minds, did not add it as bonus they must have necessarily, so far as their intention was concerned, have added it as principal. The courts will diligently look through the form of a transaction to discover illegal interest and protect the borrower from its consequences, but they will not be diligent to treat a carefully-planned disguise as other than what on its face it purports to be, and was intended to be, merely to save the lender from his usurious act.

■ Counsel for defendants do not even argue that the principal of the bond means the real principal, as distinguished from the principal which the lender so carefully set up and fixed as a measure of its return. For the court to resort to presumptions, and substitute the real principal for the self-constituted one set up by the parties, would be to make a contract for the parties which they did not intend to make.

This case is in a class entirely different from cases such as Nevels v. Harris, 129 Texas 190, 102 S. W. (2d) 1046, 109

A. L. R. 1464, which is strongly relied upon by defendants. In that case the commission note was kept entirely separate from the principal, and there was no attempt to make it appear as a part of the principal. It could be operated upon by the saving clauses without any violence whatever to the intention of the parties. Besides, it must be remembered that in that case there was the following very significant lenguage contained in the deed of trust:

"That the intention of the parties being to conform strictly to the Usury Laws now in force, *any of said contracts* for interest shall be held to be subject to reduction to the amount allowed under said Usury Laws as now or hereafter construed by the courts having jurisdiction."

No such clause appears in the contract here under review.

For the reasons stated above the loan was undoubtedly usurious from the beginning, and much of the usurious interest was carried forward when the indebtedness was renewed and made payable on a monthly plan. The Court of Civil Appeals has very thoroughly discussed the situation after such renewal, and has reached a correct conclusion in the matter of adjusting payments.

The judgment of the Court of Civil Appeals is affirmed.

Opinion adopted by the Supreme Court April 5, 1939.

Rehearing overruled June 28, 1939.